**Miguel PENA, Plaintiff,**

v.

**Shirley S. CHATER, Commissioner of Social Security Administration, Defendant.**

**No. 95 Civ. 3960(JES).**

United States District Court, S.D. New York.

June 30, 1997.

---

Bronx Legal Services, Bronx, NY (Jose L. Velez, of counsel), for Plaintiff.

Mary Jo White, United States Attorney for the Southern District of New York, New York City (Susan D. Baird, of counsel), for Defendant.

## MEMORANDUM OPINION AND ORDER

SPRIZZO, District Judge.

Pursuant to 42 U.S.C. § 405(g), plaintiff Miguel Pena ("Pena") brings the instant action challenging the decision of defendant Commissioner of the Social Security Administration (the "Commissioner") denying his application for Supplemental Security Income ("SSI") disability benefits. Pursuant to Federal Rule of Civil Procedure 12(c), Pena and the Commissioner cross-move for judg-

ment on the pleadings. For the reasons set forth below, Pena's motion is denied and the Commissioner's motion is granted.

## BACKGROUND

Plaintiff Miguel Pena was born in Puerto Rico on August 27, 1940. *See* Transcript of the Administrative Record ("Tr.") at 51. Although Pena received a sixth or seventh grade education in Puerto Rico, he claims he has little ability to read and write in Spanish or English. *Id.* at 38, 89, 105, 138. Between 1961 and 1969, Pena maintained several manual construction jobs, *see id.* at 38, 130, and worked as a house painter during part of that time. *Id.* at 47, 182. However, since 1969, Pena has not engaged in any substantial gainful activity. *Id.* at 38–39, 138.

On October 3, 1991 a physician at the Lincoln Hospital Emergency Room ("Lincoln") treated Pena for arthritic pain in the hands and knees. *See* Tr. at 219. Upon physical examination, Pena displayed limited bilateral range of motion in his shoulder. *Id.* However, no other joint effusion was detected and his reflexes were characterized as "intact." *Id.* The attending physician also noted that Pena's right pinky had been amputated. *Id.* Neurologically, Pena was described as "grossly intact." *Id.* The physician concluded that Pena suffered from varicose veins in his lower legs as well as boney enlargement of his hands and prescribed medication to relieve Pena's joint pains. *Id.*

On October 21, 1992, Pena filed an application for SSI disability benefits on the ground that he suffered from a combination of physical and mental impairments, including alcoholism, varicose veins, arthritis, blindness in the left eye and mild organic brain syndrome, all of which Pena claims preclude him from working.[1] *See* Tr. at 51, 83, 91.

Between December 8, 1992, and December 14, 1992, Pena underwent in–patient rehabilitation for alcohol addiction at the Saint Bar-

---

1. The Social Security Act defines a "disability" as the:

    inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can

    be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

    Title 42 U.S.C. § 423(d)(1)(A).

nabas Hospital detoxification unit ("St. Barnabas"). *See* Tr. at 110–29. On December 9, 1992, Pena was treated by Dr. Rubin, an attending physician at St. Barnabas, who observed varicose veins in his legs and mildly deformed index fingers on both hands. *Id.* at 122. However, a physical examination of Pena confirmed that there was no edema in his extremities and no redness or swelling in his joints. *Id.* at 120–22. Dr. Rubin reported that Pena was oriented in three spheres, neurologically "intact" and able to perform daily activities. *Id.* at 121. Upon discharge from St. Barnabas, physicians gave Pena a "fair" prognosis, noting that he had "progressed" during his seven day detoxification treatment and had demonstrated "motivation towards an alcohol-free life style." *Id.* at 116.

On January 27, 1993, Pena was examined by Dr. Peter Grahm, M.D., a consultative physician for the Social Security Administration. *See* Tr. at 130–37. Dr. Grahm reported that Pena exhibited a normal range of motion in the lumbar spine with no tenderness or paraspinal muscle spasm. *Id.* at 131. Straight leg raising was negative and Pena's muscle strength was adequate and symmetrical. *Id.* at 131–32. Although diagnostic radiology revealed degenerative osteophyte formation of the lumbar spine between the first and second vertebrae with mild degenerative disc disease at the fifth vertebrae, *see id.* at 132, 136, Dr. Grahm reported that Pena could stand on his toes and perform a full squat without difficulty. *Id.* at 132. With respect to Pena's extremities, Dr. Grahm reported full range of motion in Pena's joints with no pain, swelling, tenderness, deformity, redness or heat. *Id.* However, there were "2–3+" varicose veins in the left leg. *Id.* Neurologically, Dr. Grahm indicated that Pena was oriented and alert with gross memory intact. *Id.* In addition, Pena's sensory perception was grossly preserved to touch and vibration. *Id.* Dr. Grahm concluded that Pena had a history of alcohol abuse without

accompanying end organ damage and a history of joint pains without any functional deficits. *Id.* at 133. As a result, Dr. Grahm opined that Pena was "able to perform physical activities such as: sitting, standing, walking, lifting, carrying [and] handling objects...." *Id.*

On January 27, 1993, the same day Pena was examined by Dr. Grahm, Pena was also examined by consultative psychiatrist Dr. Luis Zeiguer, M.D., who assessed Pena's mental and emotional state at the Commissioner's request. *See* Tr. at 138–41. Pena travelled unaccompanied on public transportation to the interview and appeared clean, tidy and "meticulously dressed." *Id.* at 139. Dr. Zeiguer found Pena's speech to be communicative, productive, goal-oriented and consistent with an average psychomotor rate. *Id.* Although not intoxicated during the examination, Dr. Zeiguer observed that Pena's breath smelled of alcohol. *Id.* Pena told Dr. Zeiguer that he became alcohol dependent at the age of fifteen and occasionally experienced blackouts as well as auditory and visual hallucinations. *Id.* at 138. Pena also indicated that he slept intermittently during the night, often awaking from vivid nightmares and requiring several drinks to alleviate his shaking and vomiting before returning to sleep. *Id.* at 140. However, Dr. Zeiguer was unable to obtain a detailed or consistent account of Pena's life circumstances because Pena "gave some farfetched answers for very simple questions."[2] *Id.* at 139. Dr. Zeiguer's diagnosis was alcohol dependency with fictitious memory loss, a history of varicose veins and post-surgery status for abdominal stab wounds sustained many years earlier. *Id.* at 140. Dr. Zeiguer found Pena to be sufficiently in control of his drinking habit to manage his own funds, perform "at least simple repetitive chores ... [and] relate to peers, supervisors and tasks without disrupting the work setting." *Id.* at 141. However, Dr. Zeiguer cautioned that Pena's alcohol

---

2. For instance, Pena could not guess the current day, month or year. *See* Tr. at 139. He claimed that he did not know the name of the incumbent President of the United States and could not relate the days of the week in sequence. *Id.* On the other hand, when asked about alcohol treat-

ment, Pena stated that he regularly attended the clinic at St. Barnabas. As a result of these inconsistencies, Dr. Zeiguer concluded that Pena's distorted responses "were contrived" and he refused to classify Pena's concentration and orientation as "grossly impaired." *Id.*

problem might cause him to be "high or hung over" during the workday. *Id.*

On February 12, 1993, the Commissioner denied Pena's application for SSI disability benefits, stating that, based upon Dr. Zeiguer's and Dr. Grahm's evaluations and Pena's medical records from his detoxification program at St. Barnabas, Pena's medical condition did not prevent him from working. *See* Tr. at 64–67. The Commissioner noted that she considered factors such as Pena's medical records, age, education, training, and prior work experience in deciding how Pena's medical condition impacted his ability to work. *Id.* at 67. Specifically, the Commissioner found that Pena did not establish a combination of impairments sufficiently "severe" to preclude him from engaging in substantial gainful activity.[3] *Id.* Although Pena demonstrated that he suffered from a joint problem, the medical evidence indicated that he was able to "move about freely ... [and] function normally in every day life." *Id.* With respect to Pena's alcohol abuse, the Commissioner found that Pena's condition had been under control since he received treatment at St. Barnabas. *Id.* Based upon his age of 52 years, his seven years of education, and prior work experience, the Commissioner found that Pena could perform jobs involving "simple tasks," and therefore was not disabled within the meaning of the Social Security Act. *Id.*

On February 19, 1993, Pena filed a request for reconsideration of the Commissioner's decision. *See* Tr. at 68. On August 31, 1993, Dr. Zeiguer performed a second psychiatric evaluation of Pena. *Id.* at 182–85. During the consultative interview, Pena informed Dr. Zeiguer that he had been hospitalized for psychiatric problems in 1968 after he stabbed a relative. *Id.* at 182. Although Pena claimed that he drinks up to four pints of rum on a daily basis, he did not appear to be intoxicated nor did he smell like alcohol at the time of the examination. *Id.* at 182–83.

Dr. Zeiguer found Pena to be a well-oriented person that maintained adequate concentration and displayed a neutral, stable mood, *see* Tr. at 183, whose memory was mildly impaired as a result of chronic alcohol abuse. *Id.* at 183–84. With respect to functional abilities, Dr. Zeiguer noted that Pena engaged in household chores, managed his own financial affairs, and for recreation, watched television and played dominos or swam at the beach with friends. *Id.* at 184. Dr. Zeiguer determined that Pena suffered from mild organic brain syndrome and recommended abstinence through affiliation with a twelve–step alcohol rehabilitation program. *Id.* As in his first examination of Pena, Dr. Zeiguer again concluded that Pena should be able to perform "at least simple repetitive chores," *id.* at 185, and "relate to peers, supervisors and tasks without disrupting the work setting." *Id.*

On August 31, 1993, the same day as his second examination by Dr. Zeiguer, Pena was also examined by Dr. Myron Seidman, M.D., at the Commissioner's request, for painful varicose veins, stiff joints, alcoholism and shortness of breath. *See* Tr. at 168–81. Physical examination revealed normal wrist and elbow flexion but slight crepitus with right shoulder flexion. *Id.* at 169–70. Dr. Seidman also observed some stasis dermatitis in the left leg resulting from moderate to severe varicose veins. *Id.* at 170. Pena's vision measured 20/40 in the right eye and less than 20/200 in the left eye when aided by eye-glasses. *Id.* at 169. Upon neurologic evaluation, Dr. Seidman found Pena to be alert, relevant, coherent and without a thought disorder. *Id.* at 170. With regard to physical impairments, Dr. Seidman concluded that Pena had an obstruction or incompetence venous return left leg, a history of joint pains resulting from osteoarthritis, shortness of breath and poor vision in the left eye. *Id.* On the basis of these medical findings, Dr. Seidman opined that Pena was not limited in sitting, handling objects, speaking, hearing, or traveling but "would be limited from extensive standing, walking, pushing, [and] pulling left leg controls...." *Id.*

On October 20, 1993, the Commissioner denied Pena's application for SSI disability benefits upon reconsideration. *See* Tr. at 75–78. Based upon the medical reports used

---

3. To be "severe" an impairment must impose a significant limitation on a person's physical and mental ability to engage in basic work activities. *See* 20 C.F.R. § 416.921(a).

in the initial evaluation of his application and the medical reports from Dr. Zeiguer's and Dr. Seidman's examinations of Pena on August 31, 1993, the Commissioner recognized that Pena is "unable to perform certain kinds of work," but concluded that Pena can perform "simple tasks." *Id.* at 78.

On June 16, 1994, at Pena's request, a *de novo* hearing was held before Administrative Law Judge ("ALJ") Solomon Goldman. *See* Tr. at 34–50. Pena was represented by counsel, and a spanish language interpreter was present. *Id.* at 34. At the hearing, Pena testified as to the nature of his alcohol abuse. *Id.* at 36–37, 39–41. Pena reported consuming alcohol when he was nervous but stated that he did not drink when he lacked sufficient funds, *see id.* at 39, or when he went to the beach or the park for recreation because he felt fine and his nerves were not "damaged" there. *Id.* at 45. With regard to his functional abilities, Pena testified that he was able to remain seated for a maximum interval of ten or fifteen minutes, walk a couple of blocks, lift up to ten pounds and stand for several hours before his pain becomes too severe. *Id.* at 43–44. Pena acknowledged that he hasn't looked for work since sometime in 1991 or 1992, *see id.* at 45, and that he spends his day picking up cans, begging for money, mopping the floors of his companion's house, taking out garbage, and accompanying his companion on trips outside the home. *Id.* at 44–45. Pena testified that he entertains himself by going to the park, the beach, and playing billiards. *Id.*

On August 24, 1994, ALJ Goldman rendered a decision denying Pena's application for SSI disability benefits ("ALJ Goldman's decision"). *See* Tr. at 15–31. ALJ Goldman found that, although Pena has "an active

alcohol indulgence," his medical records do not reveal that Pena sought treatment for any "intractable painful condition or for any severe emotional distress," *see id.* at 24, and fail to establish any significant physical impairments resulting from his alcohol abuse. *Id.* at 25. ALJ Goldman found Pena's complaints of disabling physical distress to be uncorroborated by the clinical findings of non-restrictive arthritis and varicose veins, as well as Pena's unimpaired ability to perform daily activities. *See id.* at 25–26. ALJ Goldman determined that since Pena suffered from "only a very mild organic brain syndrome," he was capable of performing "simple, routine, repetitive tasks" without significant nonexertional limitations.[4] *Id.* at 26–27.

With respect to the categories on the medical–vocational guidelines (the "guidelines") set forth in Appendix 2 of 20 C.F.R. § 404, Subpt. P, ALJ Goldman found that Pena is "closely approaching advanced age," *see* Tr. at 27, ¶ 6, has a "limited (seventh grade) education," *id.* at ¶ 7, has "no exertional limits," *id.* at ¶ 4, and has no "acquired work skills which are transferrable to the skilled or semiskilled work functions of other work." *Id.* at ¶ 9[sic]. After taking administrative notice of the approximately 2,500 "medium," "light" and "sedentary" occupations[5] available in the national economy—1,400 of which are "light" and 200 of which are "sedentary"—ALJ Goldman held that, in light of Pena's residual functional capacity,[6] age, education, prior work experience, testimony and medical records, Pena did not have a "disability," *see id.* at 28, and he retained physical and mental capacity necessary to maintain gainful employment. *Id.* at 25.

---

4. According to the occupational classifications set forth in the Social Security Act, "[u]nskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time. The job may or may not require considerable strength." 20 C.F.R. § 416.968(a).

5. For the purposes of SSI disability benefits, "medium work" requires the physical capacity to lift "no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. § 416.967(c). "Light work," the next occupational category in

descending order of exertional requirements, entails "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 416.967(b). Finally, "sedentary work" involves "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. § 416.967(a).

6. "[R]esidual functional capacity is what you can still do despite your limitations." 20 C.F.R. § 416.945(a).

On October 13, 1994, Pena requested a review of ALJ Goldman's decision by the Appeals Council of the Department of Health and Human Services (the "Appeals Council") on the grounds that the decision was not based upon substantial evidence. *See* Tr. at 12–14. On April 13, 1995, the Appeals Council denied Pena's request and ALJ Goldman's decision became final. *Id.* at 4–7.

On June 1, 1995, Pena filed the instant action seeking judicial review of the Commissioner's decision. *See* Complaint ¶ 1. Pursuant to Federal Rule of Civil Procedure 12(c) ("Rule 12(c)"), Pena moves for judgment on the pleadings and requests that the Court reverse the final agency determination. Pena argues that the Commissioner committed legal error by improperly applying the medical–vocational guidelines and in failing to utilize a vocational expert to obtain evidence on how Pena's non–exertional limitations affect his ability to work and the availability of jobs. Pena also contends that the Commissioner's decision is unsupported by substantial evidence on the record, specifically that ALJ Goldman failed to specify his reasons for crediting certain evidence and discrediting other evidence in reaching his decision. On February 2, 1996, the Commissioner filed an answer in which, pursuant to Rule 12(c), she cross–moves for judgment on the pleadings, contending that her finding that Pena is not disabled is supported by substantial evidence of record.[7]

On June 21, 1996, all parties appeared before the court for Oral Argument on Pena's and the Commissioner's cross–motions for judgment on the pleadings. Thereafter, on June 28, 1996, Pena's counsel sent a letter to the Court, asserting new arguments, *inter alia,* that the Court cannot affirm ALJ Goldman's decision merely because there is substantial evidence in the record to support a finding of disability, if there also exists substantial evidence in the record that would support a finding that Pena is disabled. *See* Letter from James M. Baker, Esq., Bronx Legal Services, to Hon. John E. Sprizzo (June 28, 1996) (on file in Chambers). Final-

ly, Pena argues that, using the guidelines, he is disabled under Vocational Rule 202.09. *Id.*

## DISCUSSION

Pursuant to 42 U.S.C. § 405(g), a claimant may obtain judicial review of a final agency ruling on SSI disability benefits by filing a civil action in district court. *See* 42 U.S.C. § 405(g). In order to qualify for SSI disability benefits, a claimant must demonstrate that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1); 20 C.F.R. § 404.1527; *see also Bowen v. City of New York,* 476 U.S. 467, 470, 106 S.Ct. 2022, 2024–25, 90 L.Ed.2d 462 (1986); *White v. Secretary of HHS,* 910 F.2d 64, 65 (2d Cir.1990); *Berry v. Schweiker,* 675 F.2d 464, 467 (2d Cir.1982); *Aubeuf v. Schweiker,* 649 F.2d 107, 111 (2d Cir.1981); *Parker v. Harris,* 626 F.2d 225, 231 (2d Cir.1980). The Second Circuit has summarized the Commissioner's five-step sequential evaluation process for evaluating disability claims as follows:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a listed impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a

---

7. In accordance with 42 U.S.C. § 405(g), the Commissioner filed a certified copy of the administrative record, including all evidence used in reaching her decision, with her answer. *See* Answer ¶ 9.

listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

*Berry*, 675 F.2d at 467. The claimant bears the burden of proof as to the first four steps of the evaluation process. *Id.* If the claimant establishes that his severe impairment precludes his return to his previous occupation, the burden shifts to the Commissioner to demonstrate that the claimant retains the functional capacity to perform alternative gainful work which exists in the national economy. *See, e.g., White*, 910 F.2d at 65; *Berry*, 675 F.2d at 467; *Parker*, 626 F.2d at 231.

Pursuant to its own regulations, the Commissioner must evaluate every medical opinion it receives, regardless of its source. *See* 20 C.F.R. § 404.1527(d); *see also Schisler v. Sullivan*, 3 F.3d 563 (2d Cir.1993). In addition, the Commissioner will consider a claimant's contentions about pain or other symptoms, but these factors alone will not establish disability. *See* 20 C.F.R. § 404.1529(a). There must exist medical and clinical findings which support the conclusion that the claimant suffers from a medical impairment which could "reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all other evidence ... would lead to the conclusion that [the claimant is] disabled." *Id.* Since the Commissioner is responsible for making the ultimate determination whether or not a claimant meets the statutory definition of disability, *see* 20 C.F.R. § 404.1527(e)(1), the reviewing court should not decide the case *de novo*. *See Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991); *Parker*, 626 F.2d at 231.

## I.  SUBSTANTIAL EVIDENCE

An applicant seeking to overturn a final agency decision denying disability benefits must establish either that the Commissioner committed legal error or that the decision is not supported by substantial evidence on the record. *See Arnone v. Bowen*, 882 F.2d 34, 37 (2d Cir.1989); *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir.1987); *Mimms v. Heckler*, 750 F.2d 180, 185 (2d Cir.1984); *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983). The Supreme Court has defined "substantial evidence" as " 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971) (quoting *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229, 59 S.Ct. 206, 216–17, 83 L.Ed. 126 (1938)). The findings of the Commissioner as to any fact, if supported by substantial evidence, are conclusive. *See* 42 U.S.C. § 405(g); *Richardson*, 402 U.S. at 401, 91 S.Ct. at 1427; *Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir.1990); *Schisler v. Bowen*, 851 F.2d 43, 47 (2d Cir.1988); *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir.1982), *cert. denied*, 459 U.S. 1212, 103 S.Ct. 1207, 75 L.Ed.2d 447 (1983); *Schauer v. Schweiker*, 675 F.2d 55, 57 (2d Cir.1982); *Rivera v. Harris*, 623 F.2d 212, 216 (2d Cir.1980); *Gernavage v. Shalala*, 882 F.Supp. 1413, 1416 (S.D.N.Y.1995).

While it is undisputed that the medical testimony presented before ALJ Goldman establishes that Pena indulges in alcohol and suffers from varicose veins, arthritis and a mild organic brain disorder, the record before the Court overwhelmingly supports the finding that there exists substantial evidence to support the Commissioner's finding that Pena has "no disability." ALJ Goldman's well–reasoned and thorough decision reflects a detailed evaluation of Pena's medical records, independent and consultative physicians' diagnoses and medical opinions, Pena's subjective testimony as to his pain and disability, and regulatory vocational factors. *See* Tr. at 20–23, 26–28; *see also Mongeur*, 722 F.2d at 1037; *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir.1981); *Parker*, 626 F.2d at 231; *Bastien v. Califano*, 572 F.2d 908, 912 (2d Cir.1978).

ALJ Goldman described at length his reasons for discrediting Pena's claims of debilitating pain, including the relatively minor clinical findings of non-restrictive arthritis

and varicose veins, the absence of all but the most conservative medical treatment, and Pena's unimpaired ability to carry out daily activities. *See* Tr. at 24–25. Clearly, Pena's own testimony regarding his lifestyle and daily activities provides more than adequate support for the finding that Pena is capable of performing gainful activity. *See* Tr. at 43–45 (washing, dressing, eating, mopping the floor, taking out garbage, travels to the park, plays billiards); *id.* at 97 (laundry, cooking); *id.* at 86, 97, 103 (watches television, listens to radio, reads); *id.* at 140 (takes long walks with friends, enjoys conversing); *id.* 184 (pays monthly bills, plays dominoes, swims, converses with friends); *id.* at 38, 133, 170 (travels about the city on his own).

■ ALJ Goldman properly attributed significance to Pena's failure to undergo sustained treatment, the lack of which seriously undermines his contention that he was continuously disabled during the relevant time periods. *See Arnone,* 882 F.2d at 39. Furthermore, the Court accords deference to ALJ Goldman's evaluation since he heard Pena's testimony first–hand and observed his demeanor.[8] *Mejias v. Social Security Administration,* 445 F.Supp. 741, 744 (S.D.N.Y. 1978).

■ Pena argues that the Commissioner's decision is unsupported by substantial evidence because ALJ Goldman failed to detail his reasons for crediting certain evidence and discrediting other evidence in reaching

his decision. While the ALJ must clearly set forth the essential considerations with sufficient specificity to enable the reviewing court to decide whether the determination is supported by substantial evidence, *see White,* 910 F.2d at 65; *Ferraris v. Heckler,* 728 F.2d 582, 586 (2d Cir.1984), he need not "explicitly reconcile every conflicting shred of medical testimony." *Mongeur,* 722 F.2d at 1040 (citing *Miles,* 645 F.2d at 124). Clearly, ALJ Goldman was not required to mention every item of testimony presented to him nor explain why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability.[9] *See Mongeur,* 722 F.2d at 1040.

■ Pena contends that the Court cannot affirm ALJ Goldman's decision merely because there exists substantial evidence to support a finding of disability where there also exists substantial evidence in the record that would support a finding that Pena is disabled. However, the Second Circuit has squarely held that where a district court finds that there is substantial evidence supporting the Commissioner's decision, that decision must be upheld, even if there exists substantial evidence to support the plaintiff's position. *See Alston,* 904 F.2d at 126; *accord Schauer,* 675 F.2d at 57.

## II. ALCOHOL DEPENDENCY

■ Pena also argues that ALJ Goldman erred in failing to find that Pena has an

---

**8.** ALJ Goldman observed that Pena appeared at the hearing "clean, neatly dressed, [and was] able to provide information logically and able to relate adequately," *see* Tr. at 25, not "in significant physical or mental distress," *id.,* and was able to move about freely and provide information accurately. *Id.*

**9.** Although Pena contends that two Second Circuit decisions support his argument that, where the medical evidence in the record conflicts, the Commissioner's decision must contain at least a short statement of what evidence is being credited and why, *see Ferraris v. Heckler,* 728 F.2d 582, 587 (1984); *Johnson v. Bowen,* 817 F.2d 983, 986 (2d Cir.1987), these cases are not dispositive. In *Ferraris,* the Second Circuit reversed the district court's decision dismissing claimant's action because the court found that, based upon the ALJ's insufficient findings, it could not determine whether the ALJ's conclusory statement that the

claimant could carry out "sedentary" work was supported by substantial evidence. *See Ferraris,* 728 F.2d at 588. There, the key issue was the claimant's ability to sit for prolonged periods of time, *see id.* at 586, and the court directed the ALJ to make "specific findings of exactly what Ferraris can do, especially with reference to his ability to sit and for how long." *Id.* at 587. Here, however, ALJ Goldman has meticulously detailed his specific findings supporting his decision that Pena "does not have *any* significant exertional limitation" at all. *See* Tr. at 25, 26–28 (emphasis added)

In *Johnson,* the Second Circuit remanded the case because it was unclear from the record whether the "treating physician rule" had been properly applied. Where, as here, the "treating physician rule" has been modified by the Commissioner's regulations, *see Schisler v. Sullivan,* 3 F.3d 563 (2d Cir.1993) ("Schisler III"), *Johnson* is not controlling.

alcohol dependency disorder, which would result in a finding of disability. Regarding a claimant's history of alcohol abuse and its effect on his ability to work, the Commissioner must determine whether the claimant has lost the ability to voluntarily control his drinking where there is a "continuing interrelationship between the excess consumption of alcohol and the disability, such that termination of the former will end the latter. . . ." *See Rutherford*, 685 F.2d at 62 (citing *Adams v. Weinberger*, 548 F.2d 239, 244 (8th Cir.1977)). While chronic alcoholism can be disabling if it results in a serious personality disorder or in a substantial physical impairment, *see Rutherford*, 685 F.2d at 62, in the instant case there is nothing on the record that would support a finding that Pena is suffering from "chronic alcoholism," or that there exists a "continuing interrelationship" between Pena's drinking and any alleged disability.

Clearly, Pena's medical records and own testimony support a finding that Pena neither suffers from a serious personality disorder nor a substantial physical impairment resulting from his alcohol abuse. Dr. Rubin, an independent, attending physician at St. Barnabas' detoxification program, found that Pena was able to perform daily activities. *See* Tr. at 118. Consultative physician Dr. Graham found Pena able to "perform physical activities such as: sitting, standing, walking, lifting, carrying, handling objects, hearing, speaking and travelling." *Id.* at 133. Consultative psychiatrist Dr. Zeiguer twice found Pena to be sufficiently in control of his drinking habit to manage his own funds, perform "at least simple repetitive chores . . . [and] relate to peers, supervisors, and tasks without disrupting the work setting." *Id.* at 141, 185. Although consultative physician Dr. Seidman believed that Pena was limited from "extensive standing, walking, pushing, [and] pulling left leg controls," *see* Tr. at 170, he concluded that Pena was not limited in sitting, handling objects, hearing, speaking or travelling. *Id.* at 170. Furthermore, Pena testified before ALJ Goldman that he picks up cans, begs, performs menial janitorial tasks, and goes to the park, beach and billiard hall. *Id.* at 45. Moreover, Pena has maintained the ability to control his

drinking since he voluntarily admitted himself for detoxification treatment, *id.* at 122, and he admits that he abstains from alcohol when he is without funds, *id.* at 39, or when he is not nervous. *Id.*

■ ALJ Goldman specifically found that, according to the medical evidence of record, Pena's long history of alcoholism has not caused any significant organic complications, *see* Tr. at 23, including any related, serious end organ damage. *Id.* at 25. ALJ Goldman noted that Pena's "presentation at the clinical examinations and at the hearing does not reveal such a deterioration that would prevent him from work[ing]." *Id.* In light of the overwhelming medical and testimonial evidence supporting the Commissioner's decision, the Court finds that ALJ Goldman need not have explicitly stated on the record whether or not Pena has lost his ability to voluntarily control his drinking.

## III. VOCATIONAL EXPERT

■ Pena contends that ALJ Goldman erred in failing to employ a vocational expert to determine whether the psychological effects of his alcohol abuse limit the types of "medium," "light" and "sedentary work" that he is capable of performing. However, this contention must fail since the Commissioner may either take administrative notice of job data from various governmental publications, such as the *Dictionary of Occupational Titles* ("DOT"), or rely on the testimony of a vocational expert in order to establish that work existed in the national economy. See 20 C.F.R. § 416.966(d), (e). *See also Bapp v. Bowen*, 802 F.2d 601, 603 (2d Cir.1986) ("We believe that the mere existence of a nonexertional impairment does not automatically require the production of a vocational expert nor preclude reliance on the guidelines . . . [the] Secretary must introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain and perform"); *McLamore v. Weinberger*, 538 F.2d 572, 575 (4th Cir.1976). Therefore, ALJ Goldman need not have utilized a vocational expert in evaluating Pena's ability to work.

## IV. MEDICAL VOCATIONAL GUIDE-LINES

 Where a claimant suffers solely from an exertional impairment, the Commissioner may utilize the medical vocational guidelines in determining whether or not the claimant has a disability. These guidelines analyze various vocational factors in conjunction with residual functional capacity, resulting in a finding of "disabled" or "not disabled." *See* 20 C.F.R. Part 404, Subpt. P, App. 2, § 200.00(e)(1)(2). However, where, as here, the claimant suffers from a nonexertional impairment alone, or in conjunction with an exertional impairment which "significantly diminishes" the range of work permitted by his exertional limitations, the guidelines are not conclusive and "full consideration must be given to all of the relevant facts in the case in accordance with the definitions and discussions of each factor in the appropriate sections of the regulations...." *Id.; see also Bapp*, 802 F.2d at 605; *Tucker v. Heckler*, 776 F.2d 793, 796 (8th Cir.1985); *Francis v. Heckler*, 749 F.2d 1562, 1566 (11th Cir.1985); *Blacknall v. Heckler*, 721 F.2d 1179, 1181 (9th Cir.1983); *Smith v. Schweiker*, 719 F.2d 723, 725 (4th Cir.1984); *Hernandez v. Heckler*, 704 F.2d 857, 863 (5th Cir.1983). Since ALJ Goldman found that Pena has no exertional limits, *see* Tr. at 27 ¶ 4, and that Pena's nonexertional limitations did not significantly compromise his ability to perform work at all exertional levels, *id.* at ¶ 9[sic], the guidelines are not conclusive with respect to Pena's ability to work. Therefore, Pena's argument that he is entitled to SSI disability benefits under Vocational Rule 202.09 must fail.[10]

## CONCLUSION

For the reasons set forth above, the Clerk of Court is directed to grant the Commissioner's cross-motion for judgment on the pleadings and to dismiss the plaintiff's action.[11]

It is **SO ORDERED.**

---

10. Pena admits and ALJ Goldman found that, under the categories considered when calculating whether or not a person is "disabled" pursuant to the guidelines, Pena's previous work experience is "[u]nskilled or none," and his age is "[c]losely approaching advanced age." Pena contends that his educational category is "[i]lliterate or unable to communicate in English," therefore under Rule 202.09 he is "Disabled." However, ALJ Goldman found Pena to have a "limited (seventh grade) education" within the meaning of 20 C.F.R. § 416.964. *See* Tr. at 27, ¶ 7. Therefore even if ALJ Goldman had used the guidelines, Pena would be considered "Not Disabled" under Vocational Rule 202.10. This is further supported by the evidence in the record where Pena states on his SSI application that he enjoys reading as a hobby, *id.* a t 86, admitted to Dr. Graham that he speaks English, *id.* at 130, and acknowledges that he received six or seven years of formal education. *Id.* at 87, 138, 168.

11. Pena's age at the time of this decision is irrelevant since his medical condition and vocational profile from the time he filed his application through the date that ALJ Goldman's decision was issued is all that is before the Court at this time. *See* 20 C.F.R. § 416.330.